## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

### CASE NO.: 19-cv-61365-BLOOM/Valle

```
------------------------------------------------------X
SOUTHPOINT CONDOMINIUM                :
ASSOCIATION, INC.,                    :
                                      :
           Plaintiff,                 :
                                      :
v.                                    :
                                      :
LEXINGTON INSURANCE COMPANY,          :
                                      :
           Defendant.                 :
------------------------------------------------------X
```

## LEXINGTON INSURANCE COMPANY'S MOTION FOR LEAVE TO AMEND ITS ANSWER AND AFFIRMATIVE DEFENSES

Defendant, Lexington Insurance Company ("Lexington"), by and through undersigned counsel, and Pursuant to Federal Rule of Civil Procedure 15(a)(2), hereby submits this Motion for Leave to Amend its Answer and Affirmative Defenses.  Lexington seeks leave to assert additional Affirmative Defenses based on recently discovered evidence indicating that Plaintiff breached the Policy's "Concealment, Misrepresentation or Fraud" provision by misrepresenting the cause and extent of its alleged damages.

### RELEVANT FACTS

This is a property insurance dispute arising out of alleged damage to Plaintiff's condominium towers located at 3400 and 3410 Galt Ocean Drive, Fort Lauderdale, Florida 33308 (the "Premises") on or about September 10, 2017, as a result of Hurricane Irma.  Plaintiff contends that Hurricane Irma resulted in approximately $30,000,000 worth of wind-related

damage to the Premises, including, but not limited to, the replacement of all exterior windows and doors as well as the roofs of both towers and the lobby.

**The Policy**

Lexington issued policy number 41-LX-092177517-0 (the "Policy") to Plaintiff for the Premises, effective for the one-year period commencing May 10, 2017.  The Policy provides Building coverage for the Premises up to a limit of $70,604,377, subject to a three percent Windstorm & Hail Deductible.  Thus, claims for Windstorm are subject to a $2,118,131.31 deductible.

**The Claim and Adjustment**

Upon receipt of Plaintiff's claim in September 2017, Lexington's consultants, inspected the Premises and determined that the cost of repairing the wind-related damages was less than the applicable deductible.  The engineering firm retained by Lexington, Halliwell Engineering Associates ("HEA"), determined that the wind speeds on the date of loss were not strong enough to cause the damage alleged, and that the majority of the claimed damage existed prior to Hurricane Irma, had been caused by wear and tear/deterioration/corrosion, and was long-term in nature.  The Policy specifically excludes coverage for such damage.

Plaintiff hired the public adjustment firm GlobalPro Recovery, Inc. ("GlobalPro") as its representative in connection with this claim.  GlobalPro then hired an engineering firm, The Falcon Group ("Falcon"), to determine the cause and scope of the damage caused by Hurricane Irma, as well as a construction consultant firm, DSS Condo LLC ("DSS"), to determine the cost of repairs.

In October 2018, more than one year after Hurricane Irma, GlobalPro advised Lexington that Plaintiff's Hurricane Irma claim was for $29,521,729.  In support of this considerable claim,

GlobalPro submitted a report from Falcon and an estimate summary from DSS. Falcon's August 22, 2018 Post-Hurricane Engineering Evaluation attributes all of the observed damage to Hurricane Irma winds. (Ex. 2 [Falcon's 8/22/18 Report].) DSS's estimate, which is based on the scope prepared by Falcon, calls for the replacement of all exterior windows and doors, as well as the roofs of both towers and the lobby. (Ex. 3 [DSS Estimate].)

**The Litigation**

Plaintiff commenced this breach-of-contract action against Lexington on May 16, 2019 in the Circuit Court for Broward County. (D.E. 1.) Lexington timely removed the matter to the United States District Court for the Southern District of Florida and Answered the complaint on June 7, 2019. (D.E. 1 and 7.)

**Discovery of the First Falcon Report**

In addition to party discovery, Lexington served several subpoenas on non-parties, including Falcon and DSS. In response to Lexington's subpoena, DSS produced a number of documents that were not included in Plaintiff's document production.[1] Most notably, DSS produced a previously undisclosed March 23, 2018 Post Hurricane Irma Engineering Evaluation prepared by Falcon that is drastically different than the August 22, 2018 Falcon report produced and relied upon by Plaintiff.[2] (Ex. 4 [Falcon's 3/23/18 Report].) While not included in Plaintiff's production, DSS also produced the March 26, 2018 email that transmitted Falcon's March 23, 2018 report to Plaintiff. (Ex. 5 [3/26/18 E-Mail].)

Notably, DSS's production included a "Project Bulletin" for the week of March 26, 2018, which states: "The report from Falcon Engineering has arrived, it is being reviewed by the board of directors, Global Pro, Castle and DSSC. The public adjuster will play a key role in the next

---

[1] We have advised Plaintiff of these issues with its discovery responses/document production, among others, and we are in the process of determining whether these issues can be resolved without motion practice.
[2] Falcon also produced this draft report.

steps for the hurricane claim and DSSC will be working closely with the Global Pro team to

further this project." (Ex. 6 [3/26/18 Project Bulletin].) Apparently, the public adjuster,

GlobalPro, was unhappy with the first report inasmuch as DSS's production also includes an

April 4, 2018 email from Ben Myers of DSS to James Lagreca of DSS, which states:

> I had a recent conversation with Craig Applebaum at Global Pro, he
> expressed concern that the Falcon Report was inadequate for the needs of
> the insurance claim, he said that we were behind in our filing and asked
> for the breakdown budget. I explained to him that Falcon came highly
> recommended by Dan and that it was made abundantly clear to Falcon on
> numerous occasions that this report was to be used to bolster the insurance
> claim for Southpoint. DSSC assumed that, because of the seemingly close
> relationship between Global Pro and Falcon, that Falcon was clear on how
> the report should be written. Craig did express concern that Global Pro
> was not included in the Falcon inspections though he did not elaborate on
> in what capacity DSSC or Southpoint Management should have included
> them or at what point we should have contacted them. We finished the
> conversation with an understanding the Global Pro was to reach out to Bill
> Pyznar at Falcon to discuss the issues with the report.

(Ex. 7 [4/4/18 E-Mail].)

The first Falcon report was not produced by Plaintiff or GlobalPro. Accordingly,

Lexington was not aware of its contents when conducting their depositions in early December.

At that time, Lexington was only aware of a Falcon invoice dated September 25, 2018, indicating

that a draft report was sent to Craig Applebaum of GlobalPro prior to the date listed on the

version of the report submitted to Lexington. (Ex. 8 [9/25/18 Invoice].) When asked about this

invoice at his deposition, Applebaum testified that he could not recall any specific revisions to

the Falcon report. (Ex. 9 [Applebaum Tr.] p. 97.) Applebaum further testified that he sometimes

changes the wording of engineering reports to make them clearer. (Ex. 9, pp. 35-37.)

In fact, dramatic revisions were made to Falcon's March 23, 2018 report, which is much

different than the August 22, 2018 report submitted to Lexington in support of Plaintiff's claim.

First, the March 23, 2018 report attributes certain claimed damage to deterioration and corrosion,

4

which comments do not appear in the version of the report that was provided to Lexington. (Exs. 2 & 4.) Similarly, the March 23, 2018 report describes damage in certain photographs as deterioration and corrosion, all without any mention of wind damage; yet, in the version of the report that was provided to Lexington, the exact same photograph descriptions attribute the exact same damage entirely to wind. (Id.) Third, the March 23, 2018 report recommends merely re-caulking the windows, whereas the version of the report that was provided to Lexington recommends the windows' complete replacement. (Id.) Plaintiff's assertion that all the exterior windows and doors need to be removed and replaced, as opposed to re-caulked, added millions of dollars to this claim.

In sum, the new evidence suggests that GlobalPro was not happy with the first Falcon report, i.e., the one that attributed much of the damage to pre-existing conditions and recommended merely re-caulking them. GlobalPro, it appears, urged Falcon to change its engineering conclusions and recommendations to inflate Plaintiff's insurance claim.

**Other Issues Revealed Through Discovery**

There is yet further evidence that Plaintiff's claim is intentionally overstated, i.e., in addition to the newly discovered first Falcon report.

For one, the bids that Plaintiff received for repairs are far less than the amount of its claimed damages. Indeed, the bid selected for the building envelope repairs is in the amount of $1,471,575, and it appears that the interior repairs were performed for less than $2,000,000. (Ex. 10 [Age of Empire Contract] and Ex. 11 [Incurred Expenses Spreadsheet].) These amounts are drastically less than the $30,000,000 claim submitted by Plaintiff.

In addition, Lexington has learned that Plaintiff was aware of the pre-Irma damage to the Premises' roof, windows, and doors, and that Plaintiff even filed a lawsuit against its roofing

contractor relating to those prior issues of roof damage and water infiltration. This information somehow was omitted from Plaintiff's response to Lexington's interrogatory seeking information about pre-Irma damage to the Premises. (Ex. 12 [Rog Responses].) What is more, Plaintiff stated "[n]one" in response to an interrogatory asking it to identify all previous litigations "in which a subject matter of the lawsuit, in whole or in part, was the physical condition of the Property." (Ex. 12 at Resp. No. 2.) The fact that Plaintiff filed a litigation against its roofing contractor shows that this response was, and still is, patently false.

DSS's production also included a previously withheld Roofing Assessment Report prepared for Plaintiff by Delta Engineering in September 2013, which identified the following problems, among others, with the roofs: unsealed counter flashing; unsealed penetrations throughout the parapet walls; blisters in the membrane filled with entrapped water; deteriorated lead flashings at the emergency overflow drains; open seams; standing water; and cracked and deteriorated roof sealants. (Ex. 13 [Delta's 9/9/13 Report].) This report was not included in Plaintiff's production, and it undermines Plaintiff's claim that damage from Irma's winds made it necessary to replace the roofs.

Similarly, Plaintiff's claim includes the cost of replacing all the roofs, even though Plaintiff's roofing consultant performed a post-Irma moisture survey and determined that "there are no areas of latent moisture (Green and Red) that requires [sic] the[ir] removal and replacement." (Ex. 14 [Roof Leak Detection Company's 3/9/18 Report].)

In addition, Lexington has uncovered evidence of pre-Irma issues with the windows that Plaintiff seeks to replace through this claim. In response to reported leaks at the building, Delta Engineering performed a Preliminary Window Assessment in January 2013. The report that Delta Engineering provided to Plaintiff in connection with that assessment made it clear that

significantly deteriorated window gaskets, flashing, and sealants were allowing water to enter the building at that time.  (Ex. 15 [Delta's 1/23/13 Report].)  This is the same damage that Plaintiff now claims to have been somehow caused by Hurricane Irma's winds alone.

**The Proposed Amendment**

In light of all the newly discovered material information – that: 1) Plaintiff had its engineer alter findings to attribute all of the observed damage to wind; 2) the actual cost of repairs is far less than the amount being claimed by Plaintiff; and 3) Plaintiff was aware of pre-Irma damage to the property, and Plaintiff now claims that this same damage somehow had been caused by Hurricane Irma – Lexington hereby seeks leave to amend its answer to assert additional affirmative defenses on the basis of Plaintiff's breach of the Policy's "Concealment, Misrepresentation or Fraud" provision insofar as Plaintiff appears to have misrepresented the cause and extent of its alleged damages.

Lexington is aware that the Court's June 25, 2019 scheduling order sets August 24, 2019 as the deadline for motions to amend pleadings, but asks for permission to amend its answer because the evidence outlined above was not discovered until late December 2019.[3]

---

[3] *Warfield v. Stewart*, 2009 WL 425996 (M.D. Fla. Feb. 20, 2009) (Plaintiff was entitled to amend its complaint to add a fraud claim because any delay in the amendment was caused by defendant's failure to timely produce a disclosure document.)  Moreover, F.R.C.P. 15(d) permits a party to supplement its pleading based on information discovered since the date of the pleading to be supplemented.

## ARGUMENT

## LEAVE TO AMEND SHOULD BE GRANTED

Federal Rule of Civil Procedure 15(a)(2) states:

> Rule 15.  Amended and Supplemental Pleadings
>
> (a)     Amendments Before Trial.
>
> *     *     *
>
> (2)    *Other Amendments.*  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

The Federal Rules of Civil Procedure encourage courts liberally to grant leave for the amendment of pleadings. *See United States v. 5800 S.W. 74th Ave.*, 182 Fed. App'x 921, 924-25 (11th Cir. 2006) ("We have accepted a policy of liberal amendments and supplements to the pleadings under Rule 15."). The Eleventh Circuit Court of Appeals explained this policy in *Espey v. Wainwright*, 734 F. 2d 748, 750 (11th Cir. 1984) as follows:

> Fed. R. Civ. Proc. 15(a) governs the amendments to pleadings and provides that, after any responsive pleading has been filed, subsequent amendments are permitted only with the leave of the district court.  The decision whether to grant leave to amend is committed to the sound discretion of the trial court.  However, "discretion" may be a misleading term, for rule 15(a) severely restricts the judge's freedom, directing that leave to amend "shall be freely given when justice so requires."  This policy of Rule 15(a) in liberally permitting amendments to facilitate determination of claims on the merits circumscribes the exercise of the trial court's discretion; thus, "unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial."

Here, leave to amend is warranted inasmuch as the first Falcon report – which was improperly withheld by Plaintiff, and not discovered until December 2019 and then only through Lexington's extensive non-party discovery efforts – as well as the other newly discovered

evidence summarized above, clearly establishes that Plaintiff's claim was intentionally overstated.

## No Substantial Reason Exists to Deny the Motion to Amend

In *Espy*, the Eleventh Circuit Court of Appeals stated that, "'unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.'" 734 F.2d at 750 (citing *Dussouy v. Gulf Coast Invest. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)). Proper reasons for denying leave to amend include: (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing an amendment would cause undue prejudice to the opposing party; and (3) where the amendment would be futile. *Langlois v. Travelers Ins. Co.*, 401 Fed App'x 425, 426 (11th Cir. 2010); *Fresco v. R.L. Polk & Co.*, 2007 U.S. Dist. LEXIS 99095, at *6-7 (S.D. Fla. Dec. 13, 2007) (granting a motion for leave to amend where there was no evidence of prejudice to the opposing parties, dilatory motive or futility of the amendment); *see also Cohen v. Gulfstream Int'l Airlines, Inc.*, 2007 U.S. Dist. LEXIS 73967 (M.D. Fla. Oct. 3, 2007) (granting defendant's motion for leave to assert a counterclaim despite plaintiff's argument that the amendment was futile).

The most important consideration is whether the opposing party will be prejudiced. *See Radisson Hotels Int'l, Inc. v. Amelia Invest., Inc.*, 1992 U.S. Dist. LEXIS 9614, at *5-6 (M.D. Fla. July 6, 1992) (explaining that the "most important consideration in a court's determination of whether to grant leave to amend under *Rule 15* is whether there will be any prejudice to opposing party"); *see also M/V Skanderborg v. M/Y True Dream*, 146 F. Supp. 2d 1307, 1314 (S.D. Fla. 2001) ("'[P]erhaps the most important factor listed by the Court and the most frequent

reason for denying leave to amend is that the opposing party will be prejudiced if the movant is permitted to alter his pleading'" (citation omitted)).

Here, there has been no undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed.  The evidence that Plaintiff's claim was misstated was just discovered, and this is Lexington's first request to amend its pleading. Moreover, while Lexington proactively has sought discovery in this action, Plaintiff's discovery responses were incomplete, and it took time for Lexington to obtain and review responsive documents from subpoenaed non-parties.  Additionally, the proposed amendment is supported by solid evidence indicating that Plaintiff misrepresented the cause and extent of its claimed damage.

Finally, and most importantly, Plaintiff will not be prejudiced by the proposed amendment.   Indeed, discovery has not been completed, and the proposed amendment is consistent with Lexington's previous position that the claim is overstated.

**WHEREFORE**, for the reasons set forth above, Defendant Lexington Insurance Company respectfully requests that the Court enter an order granting this Motion for Leave to Amend Answer and Affirmative Defenses, thereby permitting Lexington to file the attached proposed Amended Answer and Affirmative Defenses.

## CERTIFICATE OF GOOD FAITH CONFERENCE

In accordance with Local Rule 7.1(a)(3), I hereby certify that counsel for the movant conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to resolve the issues.

Dated: January 16, 2020
      Fort Lauderdale, FL

MOUND COTTON WOLLAN & GREENGRASS LLP

By:

Wayne R. Glaubinger, Esq. *(pro hac vice)*
wglaubinger@moundcotton.com
Daniel M. O'Connell, Esq. *(pro hac vice)*
doconnell@moundcotton.com
Mound Cotton Wollan & Greengrass LLP
One New York Plaza
New York, NY 10004
Tel. (212) 804-4200
Fax (212) 344-8066

Brooke D. Oransky, Esq. (Fla. Bar No. 113049)
boransky@moundcotton.com
Mound Cotton Wollan & Greengrass LLP
101 N.E. Third Avenue, Suite 1500
Fort Lauderdale, FL 33301
Tel. (954) 467-5800
Fax (954) 467-5880

*Counsel for Defendant,*
*Lexington Insurance Company*