UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-61365-BLOOM/Valle

SOUTHPOINT CONDOMINIUM
ASSOCIATION, INC.,

      Plaintiff,

v.

LEXINGTON INSURANCE COMPANY,

      Defendant.

_____/

## ORDER

**THIS CAUSE** is before the Court upon Defendant, Lexington Insurance Company's ("Defendant"), Motion for Summary Judgment, ECF No. [49] ("Motion"). Plaintiff, Southpoint Condominium Association, Inc. ("Plaintiff"), filed a Response in Opposition, ECF No. [56] ("Response"), to which Defendant filed a Reply, ECF No. [60] ("Reply"). The Court has considered the Motion, the Response, the Reply, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

## I.     BACKGROUND

This matter stems from a lawsuit Plaintiff initiated in the Seventeenth Judicial Circuit in and for Broward County, Florida against Defendant, which was later removed to this Court on diversity jurisdiction. ECF No. [1].

According to the Complaint, ECF No. [1-2], Plaintiff is the owner of real property that suffered physical damage due to high winds from Hurricane Irma in September 2017. *Id.* at ¶ 6. During the relevant time period, Defendant insured Plaintiff under a commercial property coverage insurance policy bearing policy number 41-LX-092177517 (the "Policy"). *Id.* at ¶ 4. Plaintiff

alleges that the wind/hurricane damages to the property are covered under the Policy. *Id.* at ¶ 7. After Plaintiff applied for insurance benefits for the damages, Defendant allegedly "accepted coverage for Plaintiff's claim, but it failed to pay the full amount of benefits Plaintiff is entitled to receive for this loss." *Id.* at ¶ 9.

The Complaint asserts a single count for breach of contract. *Id.* at ¶¶ 11-17. Specifically, Plaintiff alleges that Defendant breached the Policy "by failing to pay the full benefits due and owing under the Policy for a covered cause of loss during the policy period," and it has been damaged by "failing to receive the full cost of repair of the damage to the property, including but not limited to, complete repair to the structure, emergency services, and all other coverages afforded by the policy for this loss." *Id.* at ¶¶ 13, 15.

On February 11, 2020, Defendant was permitted to file an Amended Answer and Affirmative Defenses, ECF No. [30], asserting additional affirmative defenses because of Plaintiff's alleged breach of the policy's Concealment, Misrepresentation or Fraud provision. The Defendant now seeks summary judgment in its favor based on Plaintiff's alleged breach of that same provision. *See* ECF No. [49].

## II.    MATERIAL FACTS

Based on the parties' statements and counterstatements of material facts,[1] along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

---

[1] Defendant filed its Statement of Material Facts, ECF No. [50] ("Def.'s SOMF"), and Plaintiff filed an Opposing Statement of Material Facts, ECF No. [55] ("Pls.' SOMF"), which asserted additional material facts. Defendant filed a Reply Statement of Material Facts, ECF No. [61] ("Reply SOMF"). A party's failure to controvert an opposing statement of material facts deems those facts admitted. *See* L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts[.]").

### A.    The policy and the claim

Defendant issued an insurance policy bearing policy number 41-LX-092177517 to Plaintiff insuring the condominium towers located at 3400 and 3410 Galt Ocean Drive, Fort Lauderdale, Florida 33308 (the "Premises"), effective for the one-year period commencing May 10, 2017. Def's SOMF at ¶ 1. According to Defendant, the claims for windstorm are subject to a $2,118,131.31 deductible, whereas Plaintiff asserts that the deductible for each building is $1,052,079.54, which is 3% of each building's value of $35,069,318.00. Pls.' SOMF at ¶ 1.[2] On or about September 13, 2017, Plaintiff notified Defendant of its claim for wind damage to the Premises from Hurricane Irma. Def.'s SOMF at ¶ 2. Defendant's consultants then inspected the Premises and determined that the cost of repairing the wind-related damages was less than the deductible amount. Pls.' SOMF at ¶ 3.

Defendant retained an engineering firm, Halliwell Engineering Associates ("Halliwell"), to "provide an engineering opinion on the scope as well as the cause and origin of the claimed damage of water intrusion via windows, doors (swing and sliding) to the interior, as well as possible wind damage to the roof systems, and general building envelope, as a result of the Weather Event that occurred on the Date of Loss (DOL), September 10, 2017." ECF No. [49-11] at 1-2. The Halliwell engineering report noted that Hurricane Irma caused damages to the Premises, including by wind, but the Premises also had pre-existing damages to the roof, sliding glass doors

---

[2] The parties cite to pages 7 through 9 of ECF No. [37-1] to support their positions regarding the Policy and the deductible amount. However, those pages, and virtually every page contained within that docket entry, are illegible. Because the Court is unable to examine the contents of that document, the Court instead looks to a copy of the Policy that is attached to the Complaint, *see* ECF No. [1-2] at 6-87, which copy is legible. This document reflects that the "agreed value" of the "building" is $70,604,377 and that the "windstorm & hail deductible" is 3% with a "minimum dollar deductible" of $50,000. *See id.* at 13.

and windows, exterior stucco finish, and other areas. *Id.* at 9-16. The Policy excludes coverage for damages caused by wear and tear, deterioration, decay, rust, corrosion, settling, cracking, shrinking or expansion. ECF No. [1-2] at 60.

On October 13, 2017, Plaintiff hired the public adjustment firm, Global Pro Recovery, Inc. ("Global Pro"), to act as "its representative under the insurance contract issued" by Defendant. Def.'s SOMF at ¶ 5. Plaintiff also hired the engineering firm, The Falcon Group ("Falcon"), to determine the cause and scope of the damage caused by Hurricane Irma, as well as a construction consultant firm, DSS Condo LLC ("DSS"), to determine the cost of repairs. *Id.* at ¶ 6. In October 2018, Plaintiff submitted its Hurricane Irma claim in the amount of $29,521,729.00 in damages. *Id.* at ¶ 7. In support of this claim, Plaintiff submitted an August 22, 2018 report from Falcon and a September 7, 2018 estimate from DSS. *Id.* Falcon's August 22, 2018 Post-Hurricane Engineering Evaluation ("August Falcon Report") attributes all of the observed damage to Hurricane Irma's winds. Pls.' SOMF at ¶ 8. Plaintiff states that the August Falcon Report "does not incorporate all observed damages," but rather incorporates only "those damages that Falcon determined could be attributed to the Hurricane." *Id.* (citing ECF No. [49-2] at 85, 92-93). DSS' September 2018 estimate calls for the replacement of all exterior windows, the roofs of both towers, and the lobby. *Id.* DSS' estimate was purportedly based on the scope prepared by Falcon. *Id.*

**B.    Plaintiff's discovery responses**

In response to Defendant's interrogatory requesting that Plaintiff describe in "detail the cause(s), nature, and extent of all of the alleged physical damage to the Property that is the subject of the Claim," Plaintiff stated that the "damage was caused by Hurricane Irma" but that for the "most complete description of the nature and extent of the damages, refer to the estimates, reports, and invoices for incurred expenses being produced herewith[.]" ECF No. [22-12] at 1. Plaintiff

4

contends that it "clarified" its response in its amended interrogatory answer by stating that "[t]he damage was caused by Hurricane Irma. The buildings suffered water and sand intrusion to a vast majority of the condominium units, as well as common areas. The buildings also suffered wind damage to the roofs and windows." Pls.' SOMF at ¶ 10 (citing ECF No. [55-4]). Plaintiff's initial interrogatory response asserted that the cost to repair the physical damage at the Premises was $28,986,615.00. *Id.*

In response to Defendant's request for Plaintiff to identify pre-existing damages (including deterioration, rust, wear and tear, water leaks, or malfunction of any kind), Plaintiff informed Defendant that pre-loss renovation had taken place at the Premises. *Id.* at ¶ 11. Specifically, Plaintiff stated that "[t]he South Condominium complex underwent major renovation to the exterior of the building between 2012 and 2017. All balconies were replaced, windows and sliding glass doors were repaired and resealed, curbing around windows and doors was repaired, concrete and stucco were repaired and patched, and the buildings were completely repainted. Additionally, the pool deck, promenade, tennis courts, garages, and elevators were all renovated. Following the renovations at the property, the complex underwent a 40-Year Recertification confirming the completion of all necessary repairs to the property prior to the loss." ECF No. [22-12] at 3.

In response to an interrogatory asking Plaintiff to identify all previous litigations "in which a subject matter of the lawsuit, in whole or in part, was the physical condition of the Property," Plaintiff responded "[n]one." Def.'s SOMF at ¶ 12. Plaintiff contends that this was an "inadvertent oversight" and that it has since amended its response. Pls.' SOMF at ¶ 12 (citing ECF No. [55-4] at 2-3). *See also id.* at ¶ 23. In response to Defendant's request for audio or video recordings of its Board of Directors' meetings from January 1, 2015 through May 16, 2019, Plaintiff stated "[n]one." *Id.* at ¶ 13. Plaintiff asserts that this response was a "clerical error." *Id.*

### C.    Plaintiff's Rule 30(b)(6) witness' deposition

In addition to written discovery, Defendant requested the deposition of Plaintiff's representative with the most knowledge regarding, among other things, the pre-loss condition of the Premises and pre-loss renovations. Plaintiff, in response, produced its property manager, Ryan Johnson ("Mr. Johnson"). Def.'s SOMF at ¶ 14. Mr. Johnson testified that Plaintiff was aware that its insurance claim included the cost of replacing all exterior windows and all three roofs (two towers and the lobby). Pls.' SOMF at ¶ 15. He added that it was his understanding that Falcon "call[ed] for every window and door to be replaced." *Id.* (quoting from ECF No. [37-3] at 164:16-18). Mr. Johnson testified that the DSS damages estimate was submitted to Plaintiff's Board of Directors before it was provided to Defendant, and the Board "agreed with" the estimate although it did not "per se" independently approve it. ECF No. [37-3] at 238:21-239:3.[3] No one from Plaintiff's side "voice[d] any objection to the DSS Condo estimate[.]" *Id.* at 239:4-6.

Mr. Johnson testified that the August Falcon Report recommended replacement of racked windows and doors, yet the report does not identify specific windows and doors. ECF No. [37-1] at 244. He stated that the specific windows would appear in the DSS estimate. *Id.* The DSS estimate included "every window and door[.]" *Id.* He also testified that the August Falcon Report does not identify specific windows and doors that need to be re-caulked. ECF No. [37-1] at 244. However, he believed that Falcon identified those specific items "in their direction to DSS." *Id.* Although Plaintiff's claim included replacing all three roofs at the Premises, a moisture survey performed for Plaintiff by Roof Leak Detection Company five months after Hurricane Irma concluded that

---

[3] According to Plaintiff, Global Pro provided the claim package to the Southpoint Board of Directors for review before it was submitted to Defendant. Pls.' SOMF at ¶ 16 (citing ECF No. [55-7] at ¶ 13).

"there are no areas of latent moisture (Green and Red) that requires the removal and replacement." Def.'s SOMF at ¶ 19. Additionally, the company Plaintiff hired to perform a post-loss appraisal of the Premises in April 2018 inspected the roofs and determined that "[t]here are no known roof leaks on any of the buildings." *Id.* at ¶ 20. According to Plaintiff, these March and April 2018 inspections were conducted after some "temporary repairs" had been performed on the roofs by Pritts roofers in September, October, and November 2017. Pls.' SOMF at ¶¶ 19-20 (citing ECF No. [55-8]).

During Mr. Johnson's re-deposition in March 2020, he acknowledged that the claim Plaintiff submitted called for all of the roofs to be replaced, and he was unsure why the complete replacement of the roofs was included. *Id.* at ¶ 21. However, he had previously testified that at the time the claim was submitted, it was his understanding that the DSS estimate was based on the scope prepared by Falcon. *Id.*[4] During his initial deposition, it was also revealed that Plaintiff had filed a lawsuit against its roofing contractor, Pritts, related to issues of roof damage and water infiltration prior to Hurricane Irma. Def.'s SOMF at ¶ 22.[5] Plaintiff adds that the lawsuit was settled and Pritts made roof repairs in 2015 that were warrantied for 10 years. Pls.' SOMF at ¶ 22 (citing ECF No. [55-9] at ¶¶ 4-8). Mr. Johnson also testified that prior to Hurricane Irma, the roof to his knowledge had not leaked, and he was not sure if the roof was repaired in 2015 due to an issue with water infiltration. *Id.* at ¶ 24 (citing ECF No. [37-3] at 74).

Mr. Johnson was also questioned about a January 23, 2013 window assessment report from Delta Engineering prepared for Plaintiff in response to complaints of water infiltration. *Id.* at ¶ 25.

---

[4] Plaintiff incorrectly cites to ECF No. [37-1] at 243:23-25. The correct citation is to ECF No. [37-3] at 243:23-25.

[5] The parties again incorrectly cite to ECF No. [37-1] rather than ECF No. [37-3].

This evaluation identified deteriorated window gaskets, flashing, and sealants. ECF No. [22-15] at 4. Mr. Johnson testified that windows were resealed as part of the 40-year recertification project. *Id.* at ¶ 26. Mr. Johnson testified that he did not know what was done to ensure that no pre-loss damages were included in Plaintiff's claim. *Id.* at ¶ 27. He likewise testified that he did not know if Falcon was able to determine what damages were pre-existing as opposed to damage caused by Hurricane Irma. *Id.* The Delta pre-loss window report was not provided to Falcon. *Id.* at ¶ 28.[6] The parties disagree whether the Delta pre-loss report was provided to DSS. *Id.*

Following Hurricane Irma, the Board of Directors passed a $2.2 million Special Loss Assessment even though the insurance claim was for approximately $30 million. Def.'s SOMF at ¶ 29.[7] The Board determined the Special Loss Assessment's amount. *Id.* at ¶ 30. The Condo Bylaws required the Board to approve a special assessment "so as to obtain the necessary funds to repair and replace the improvements." *Id.* Plaintiff asserts, however, that the assessment was to cover the deductible, not pay the full amount of the property damages. Pls.' SOMF at ¶¶ 29-30 (citing ECF Nos. [55-7] at ¶ 7; [55-9] at ¶ 13). Plaintiff also received bids to repair the alleged damages for less than the submitted insurance claim. Specifically, Plaintiff selected a bid for building envelope repairs in the amount of $1,471,575.00 with Age of Empire, and the interior repairs were performed for less than $2,000,000.00. Def.'s SOMF at ¶ 31. Plaintiff confirmed that Age of Empire was hired to perform the envelope repairs called for by Falcon with a base bid of less than $1.5 million. *Id.* at ¶ 32. Plaintiff states, however, that the Age of Empire contract "is intended as a temporary repair to the buildings," and that the contract price is a "base bid" that will

---

[6] The parties again incorrectly cite to ECF No. [37-1] rather than ECF No. [37-3].

[7] Docket entries [37-4] and [37-5], which Defendant cites to, are entirely illegible.

have a "much higher" final cost once all quantities of sealant, caulk, stucco, concrete, and labor are known. Pls.' SOMF at ¶¶ 31-32 (citing ECF Nos. [55-7] at ¶¶ 19-20; [55-9] at ¶¶ 23-24).

### D.   Discovery of unproduced documents

In response to Defendant's subpoena, DSS produced a previously undisclosed March 23, 2018 Post Hurricane Irma Engineering Evaluation prepared by Falcon ("March Falcon Report") that differs from the August Falcon Report that had been produced to Defendant. Def.'s SOMF at ¶ 34. While not included in Plaintiff's production, DSS also produced a March 26, 2018 email that transmitted the March Falcon Report to Plaintiff. *Id.* at ¶ 35. Plaintiff contends that Mr. Johnson did not locate this email when he ran searches for responsive emails to Defendant's discovery. Pl.s' SOMF at ¶ 35. DSS' production also included a "Project Bulletin" for the week of March 26, 2018, which states that "[t]he report from Falcon Engineering has arrived, it is being reviewed by the board of directors, Global Pro, Castle and DSSC. The public adjuster will play a key role in the next steps for the hurricane claim and DSSC will be working closely with the Global Pro team to further this project." Def.'s SOMF at ¶ 36. Plaintiff asserts that DSS drafted the "Project Bulletin" and that DSS maintained that record, not Plaintiff. Pls.' SOMF at ¶ 36 (citing ECF No. [55-9] at ¶¶ 15, 32).

DSS also produced an email dated April 4, 2018 from Ben Myers of DSS to James Lagreca of DSS, discussing the March Falcon Report as follows:

> I had a recent conversation with Craig Applebaum at Global Pro, he expressed concern that the Falcon Report was inadequate for the needs of the insurance claim, he said that we were behind in our filing and asked for the breakdown budget. I explained to him that Falcon came highly recommended by Dan and that it was made abundantly clear to Falcon on numerous occasions that this report was to be used to bolster the insurance claim for Southpoint. DSSC assumed that, because of the seemingly close relationship between Global Pro and Falcon, that Falcon was clear on how the report should be written. Craig did express concern that Global Pro was not included in the Falcon inspections though he did not elaborate on in what capacity DSSC or Southpoint Management should have included them or at

> what point we should have contacted them. We finished the conversation with an
> understanding the Global Pro was to reach out to Bill Pyznar at Falcon to discuss
> the issues with the report.

*Id.* at ¶ 37. The March Falcon Report had not been produced by Plaintiff or Global Pro, and

Defendant was not aware of it when it conducted Plaintiff's and Global Pro's depositions in

December 2019. *Id.* at ¶ 38. Plaintiff asserts that it did not maintain the March Falcon Report

"because it was subsequently revised," and it "retained only the final version of the report." *Id.*

During his December 2019 deposition, Mr. Johnson testified that any exterior damage to the

Premises that Falcon identified was caused by wind from Hurricane Irma. *Id.* at ¶ 39. Mr.

Appelbaum (of Global Pro) could not recall any changes to the March Falcon Report, but he

conceded that he typically makes "grammar" and "nomenclature" changes to Falcon's engineering

reports. Def.'s SOMF at ¶ 40. When asked what he meant by "nomenclature," Mr. Appelbaum

stated "mak[ing] sure that the message that they're trying to convey is being conveyed. So intent

versus perception. Make sure the intent of their words doesn't get confused or misperceived by the

reader." ECF No. [22-9] at 36:1-12.

Plaintiff disputes that the March Falcon Report "makes it clear that it determined that much

of the claimed damage was caused by the excluded causes of deterioration and corrosion whereas"

the August Falcon Report "attributes all of the damage to wind." Pls.' SOMF at ¶ 41. Specifically,

Sinisa Kolar ("Mr. Kolar") of Falcon testified that "obviously we were hired after Hurricane Irma,

so the intent [of Falcon's assessment of the Premises] was to be focused on Hurricane Irma.

However, initially when I produced a report, that report contained information that may not

necessarily be attributed to Hurricane Irma." ECF No. [49-2] at 35-36. The March Falcon Report,

he stated, was the "initial assessment of the property," but that "[a]fter reviewing that report with

the association and discussing the content of the report, it was decided that further investigation is

Case No. 19-cv-61365-BLOOM/Valle

necessary and that we should, you know, eliminate from the report anything that could be ambiguous or not related to Hurricane Irma." *Id.* at 36-37. He testified that he was later told that certain words used in the March Falcon Report needed to be "clarified." *Id.* at 39. In particular, "we were basically asked to explain the definition of words in our initial report, such as 'corrosion' or 'deterioration'" by Mr. Appelbaum. *Id.*

He stated that although the word "corrosion" was included in the March Falcon Report, it was omitted from the August Falcon Report. *Id.* at 39-40. He testified that "corrosion" was removed because of "inability from anyone at that point to pinpoint in time when the corrosion actually started. So in order to avoid having a discussion of whether this is or it's not a damage that resulted from Irma, anything that had to do with corrosion was simply removed from the report." *Id.* at 40. Regarding the word "deterioration," Mr. Kolar acknowledged that that term was included in the March Falcon Report. *Id.* at 41. He stated that this term was used to "describe that there is something wrong with [the] item we were describing in the report. Technically it was used to describe a damage. Because of exactly what you're saying that the word actually means damage over time, you know, it was decided that if it cannot be determined if it happened in the short term or the long term, these items are better removed from the report." *Id.* at 42. He added that Falcon "sometimes" "just erroneously used the word 'deterioration' to describe the damage." *Id.* at 42-43.

In regard to his discussion with Mr. Appelbaum about these words, he testified that "[w]hat we talked about, the intent of clarifying those words was if we cannot confirm that corrosion occurred post Hurricane Irma, we should remove the item from the report altogether. And in regard to the word 'deterioration,' if the deterioration is a damage as a result of damage from Irma, it should be worded as damage and was never deterioration that had a time frame that predates Irma

should be removed from the report, the item altogether." *Id.* at 45. He added that the "intent of the report is still the same." *Id.* at 46. The March Falcon Report, which was shared with the Board and property management, describes the damage observed using the words "corrosion," "rust" and/or "deterioration" a total of forty-eight (48) times. These same words are not used in the August Falcon Report. Def.'s SOMF at ¶ 42 (citing ECF Nos. [22-4] and [22-2]).

DSS also produced a September 2013 Roofing Assessment Report prepared for Plaintiff by Delta Engineering in connection with Plaintiff's lawsuit against Pritts. *Id.* at ¶ 43. This report, which had not been previously produced by Plaintiff, identified the following problems with the roofs, among others: unsealed counter flashing; unsealed penetrations throughout the parapet walls; blisters in the membrane filled with entrapped water; deteriorated lead flashings at the emergency overflow drains; open seams; standing water; cracked and deteriorated roof sealants. *Id.* The Delta Roofing assessment was not included in Plaintiff's production. *Id.* at ¶ 44.

Upon learning of the March Falcon Report and other evidence regarding a potentially inflated claim, Defendant moved to amend its Answer to assert additional defenses based on Plaintiff's alleged breach of the Policy's Concealment, Misrepresentation or Fraud provision, which the Court granted on February 11, 2020. Pls.' SOMF at ¶ 45. Defendant served its Amended Answer that same day. *Id.*

### E.   Plaintiff's supplemental production

After learning that Defendant obtained the March Falcon Report from DSS, and in response to at least one follow-up request for outstanding emails, in March 2020 Plaintiff produced additional emails showing that Falcon's March 23, 2018 report also was shared with Plaintiff's Board of Directors and public adjuster in March 2018. *Id.* at ¶ 46. Plaintiff's supplemental production also included a January 2018 roof repair proposal from Plaintiff's roofer, Pritts, in the

amount of $18,500 and emails related to that proposal. Def.'s SOMF at ¶ 47. These items had not been previously produced. *Id.* The email chain reflects that on January 15, 2018, Pritts sent an email (and attached proposal) to Mr. Johnson about the roof repair proposal. ECF No. [49-1] at 2. Mr. Johnson then forwarded that email and proposal to Global Pro stating, "I think that we may be better off after Falcon has had the opportunity to review and assess[.]" *Id.* at 1. In response, Global Pro stated that "[b]efore we obtain proposals for work associated with damages caused by the storm, please let the experts complete their inspections and reports. We don't have a scope of damages yet and this documentation does not help in anyway. No testing was performed and we have no idea the conditions of the substrate. All of this will be confirmed by the experts so that an accurate assessment of your damages can be made." *Id.* Mr. Johnson then responded that he "completely agree[d] with" Global Pro's advice. *Id.*

Plaintiff's supplemental production also included a November 21, 2017 report from ONM&J, another engineering firm involved with pre-loss renovations at the Premises. Pls.' SOMF at ¶ 49 (citing ECF No. [49-9]). The report was not previously produced. The report stated that the purpose of the visit "was to review the reported water intrusion in units 1102N, 1202N, and 1202S," and the report "is intended to present the results of the visual review." ECF No. [49-9] at 1. The report concluded that "[t]he reported water intrusion from Hurricane Irma appears to be concentrated primarily at the corner units of the building. . . . It has also been reported that the windows in these corner units have been replaced. . . . In addition hairline cracks were observed on the underside of the concrete slab at the corner of the building/unit. These hairline cracks located in front of the corner concrete columns are typical of expansion/contraction cracks that occur during or shortly thereafter the original construction of the building. . . . The exterior old

caulking around the windows should also be investigated since it was not completely replaced during the previous painting of the building." *Id.* at 2.

Plaintiff's supplemental production also included a previously unproduced sworn proof of loss that Plaintiff had submitted to its glass carrier, which indicated that a total of five window panes were broken as a result of Hurricane Irma. Def.'s SOMF at ¶ 50. Plaintiff contends that "[g]lass breakage is covered under a separate insurance policy." Pls.' SOMF at ¶ 50. Additionally, although Plaintiff initially stated "[n]one" in response to Defendant's request for all audio or video recordings of any meetings of Plaintiff's Board of Directors of Southpoint from January 1, 2015 through May 16, 2019, ECF No. [49-19] at 1, Defendant subsequently obtained recordings of certain Board meetings. Pls.' SOMF at ¶ 51. Plaintiff asserts that it provided Defendant links to certain audio meetings that took place during January 2018 to July 2019. *See id.* (citing ECF No. [55-6]). It also disputes that the recordings "make it clear that Plaintiff, and specifically Plaintiff's Board of Directors, was well aware its claim included the cost of repairs that were not related to the hurricane." *Id.*

At a February 20, 2018 Board meeting, the public adjuster instructed the residents not to speak with Defendant's consultants and told them that comments about pre-existing damage were not in Plaintiff's best interest. *Id.* at ¶ 52.[8] Plaintiff asserts that the public adjuster also stated that "[w]ithout a full on investigation into those [conditions], all it is going to do is make the claim take longer. We are here to identify exclusively those damages from [H]urricane Irma based on our experts [sic] opinions and working with them, so we can put together a true and accurate

---

[8] The links to the audio recordings cited by the parties is password protected. *See* Def.'s SOMF at ¶ 52 n.2. *See also* ECF No. [49] at 5 n.2. The password is "board." *Id.* Plaintiff admits the above-referenced statement of fact. *See* Pls.' SOMF at ¶ 52. The Court, however, has not been able to evaluate the minute sections referenced by Defendant in its Statement of Facts at the link provided.

assessment of the loss." *Id.*[9] Despite being present for this meeting, neither the Board members nor the property manager interjected during the public adjuster's presentation at the meeting. *Id.* at ¶ 53.

During a November 29, 2018 meeting, a resident stated that she and other residents were "concerned" because the claim was for $30 million and, when she was "looking it over," "it's asking for so much that wasn't damaged to get done." *See id.* at ¶ 54 (minutes at 36:15-36:40). The Board president then immediately asked her to "stop that type of language right now because this is being recorded and this does not need to go further with that type of language." *Id.* at 36:40-36:46. He then instructed her to "not make those kinds of statements because they are not accurate." *Id.* at 36:50-36:54. The resident opined that a "more realistic amount" of the claim "should have been discussed." *Id.* at 38:25-38:50. According to Plaintiff, "this resident had never reviewed the claim package," and her statement was made more than a year after the claim, and the president "knew that it was reasonably likely that this matter would end up in litigation." ECF No. [55-7] at ¶ 16.

During a January 31, 2019 meeting, the Board president stated that the bids for the actual repairs being discussed are the "real numbers" and "have nothing to do with the insurance claim." Pls.' SOMF at ¶ 55 (minutes at 2:37-3:20). Additionally, when discussing replacing the windows, the president stated that "this does not have anything to do with the claim, but obviously we have all of this in the claim." *Id.* (minutes at 34:35-34:50). The president's May 2020 affidavit states that the "contracts were for temporary repairs to prevent further water intrusion into the building, which must be done regardless of whether the claim was paid." *Id.* (citing ECF No. [55-7] at ¶ 18).

---

[9] Although Plaintiff directs the Court to minutes 15:00-16:15, as noted, the Court has not been able to confirm these minute sections referenced at the link provided in Plaintiff's Statement of Facts.

He also stated that "additional repairs would still be necessary, as the bids did not encompass the full amount of work that would be necessary to repair the property as a result of Hurricane Irma." *Id.* He further declared that he was "trying to explain to the residents that this contract did not match what was submitted with the insurance claim, because the repair proposals were not intended to completely repair all of the storm damage." *Id.*

Plaintiff attempted to explain its failure to produce the initial March Falcon Report and communications related to it by stating that its initial production was based on searches for emails that contained the words "hurricane" or "Irma." Def.'s SOMF at ¶ 56 (citing ECF Nos. [49-4] and [49-10]). According to Defendant, however, this explanation "makes no sense as the majority of withheld emails contain the words 'hurricane' or 'Irma'" and when asked at his second deposition, Mr. Johnson could not explain why Plaintiff did not disclose these emails. *Id.* (citing ECF No. [49-4] at 295-96, 309-13, 375-76).

### F.   Depositions of the engineer and contractor responsible for the pre-loss renovations

The 2013 Delta window report depicts pre-existing damage issues with the windows. Pls.' SOMF at ¶ 58. That report noted deteriorated window gaskets, still flashings, and sealants at numerous units at the Premises, which provided a "pathway for water intrusion." ECF No. [22-15] at 4. Based on the conditions observed, Delta recommended various window repairs, including replacing windows in 33 of the units inspected. *Id.* Plaintiff asserts that following this report, Carousel Development and Restoration, Inc. ("Carousel") then replaced all of the balconies at the Premises, performed stucco repairs on the two towers, painted the buildings, and did caulking on some windows. Pls.' SOMF at ¶ 58 (citing ECF Nos. [49-7] at 13-16). Plaintiff adds that following the restoration projects at the building, it was not aware of water intrusion issues to any units, except one, but that after Hurricane Irma, there was water damage in nearly 300 of the 400 units.

16

*Id.* (citing ECF Nos. [55-7] at ¶¶ 5-6; [55-9] at ¶¶ 10-11). During their depositions, the engineer who performed the pre-loss window assessment, Steven Mainardi, P.E., and the contractor responsible for the pre-loss renovations, Carlos Ramirez (of Carousel), both confirmed that the window repairs Delta determined were needed were not part of the pre-loss renovation work done by Carousel. Def.'s SOMF at ¶ 59 (citing ECF Nos. [49-6] at 75; [49-7] at 31, 34). According to Plaintiff, windows and doors in four of the units were replaced after the 2013 Delta report but before Hurricane Irma. Pls.' SOMF at ¶ 59 (citing ECF No. [55-10]).

### G.    Deposition of Falcon engineer, Mr. Kolar

Mr. Kolar authored the Falcon reports at issue. Def.'s SOMF at ¶ 60. Regarding the March Falcon Report, Mr. Kolar testified that he recalled discussing that the report was "too broad and that [Falcon] need[ed] to focus on items that are Hurricane Irma-related and inspect more units to ensure that report has a better backup to be better substantiated." ECF No. [49-2] at 81-82. He further stated that "at that meeting we made a decision that we need to again narrow down the focus of the report as well as we were obtaining additional information as we were going along, learning information from the building, and we were incorporating all of that into the report to make the report be, you know, basically written for the purposes of evaluating the damages as a result of Hurricane Irma." *Id.* at 83. He acknowledged that the August Falcon Report removed information about "corrosion stains" that had been identified in the March Falcon Report. *Id.* at 84-85. He stated that this was removed "because of [Falcon's] inability to confirm the presence of those prior or not presence prior to Irma." *Id.* at 85.

When asked about the March Falcon Report's statement that "the roof is in fair condition. Multiple deficiencies were identified, such as blisters in the wall, rusted pipes, exposed electrical cables, cracks in walls, unleveled gravel terrain, and corrosion spots," he explained that the "rusted

pipes" and "corrosion spots" were removed from the August Falcon Report because "it's ambiguous and we didn't want the report to have ambiguous information." *Id.* at 92-93. He testified that "rusted pipes" and "corrosion spots" are "open to debate whether that corrosion occurred before or after the hurricane." *Id.* at 93. He also testified that before the lawsuit was filed, Falcon had a "discussion [with Plaintiff's Board or property management] in general about the assessment of the building as it pertains to the first and then the second report . . . but the discussion about whether some of these things could have been potentially preexisting or not is definitely, in my opinion, was understood." *Id.* at 150-51. Mr. Johnson affirmed, in relation to the August Falcon Report, that "[a]ny exterior damage that Falcon identified they claim was caused by wind from Irma." ECF No. [37-3] at 245.

Neither the March nor August Falcon Reports recommended replacing the roofs. Def.'s SOMF at ¶ 61. Mr. Kolar testified that he did not recall recommending anybody to replace the roofs. ECF No. [49-2] at 103-04. Likewise, neither the March or August Falcon Reports recommended replacing all exterior windows. Def.'s SOMF at ¶ 62. Mr. Kolar also testified that he did not determine that every single window in the buildings needed to be replaced, and he does not recall advising the Board, DSS, Global Pro, or Mr. Johnson that every single window had to be replaced. ECF No. [49-2] at 109-11. Mr. Kolar stated that he did not provide DSS with the scope for its damage estimate and that he never reviewed the estimate prepared by DSS. Def.'s SOMF at ¶ 63.

Falcon asked Plaintiff to provide it with pre-loss engineering reports related to the pre-loss condition of the structure. *Id.* at ¶ 64. Despite this request, Plaintiff did not provide Falcon with Delta's January 2013 or September 2013 reports, which detailed pre-existing issues with the windows and roofs. *Id.* at ¶ 65. Plaintiff (through Mr. Johnson) asserts that prior to April 2017,

Plaintiff "did not have an established system for record keeping" and engineering reports were maintained in hard copies and stored in boxes without indexes or contents lists for the boxes. Pls.' SOMF at ¶ 65 (citing ECF No. [55-9] at ¶¶ 29-31). Plaintiff informed Mr. Kolar of recent renovations at the Premises, and he relied on information regarding the building renovations in formulating his opinions. Pls.' SOMF at ¶ 66. In discussing the March Falcon Report, Mr. Kolar testified that he "assumed" cracks observed in the concrete "were caused by the hurricane" based on discussions with Plaintiff in which "none of the management team or other people we interviewed have a recollection of seeing visible or other cracks on the building." ECF No. [49-2] at 98-99, 132-33. Further, when shown Delta's pre-loss window assessment at his deposition, Mr. Kolar testified that he would have "love[d]" to have had this report earlier. Def.'s SOMF at ¶ 67.

### H.    Deposition of Plaintiff's building consultant, James LaGreca

The author of Plaintiff's damage estimate, Mr. LaGreca, could not explain why he included the cost of replacing all the exterior windows and the roofs. *Id.* at ¶ 68. Plaintiff asserts that pursuant to its contract with DSS, it believed that DSS was identifying specific items of loss that required repair as a result of wind damage. Pls.' SOMF at ¶ 68 (citing ECF No. [55-11] at 11). LaGreca testified that the scope for his estimates was provided by Global Pro and Plaintiff. *Id.* at ¶ 69. He further testified that he did not recall if he communicated with Falcon or reviewed any of the Falcon reports in connection with preparing his damages estimates. ECF No. [49-3] at 31, 89. As far as the scope for determining what repairs needed to be made, he did not know who made those decisions, *id.* at 30-31, 35, he could not recall how the scope was provided to DSS, *id.* at 78, and he could not recall the discussions with Plaintiff's management or Global Pro about specifically what DSS was asked to do or scope of work. *Id.* at 115-16, 118. LaGreca could not

identify anything that was done to ensure his estimate included only repairs related to damage caused by Hurricane Irma. Def.'s SOMF at ¶ 69.

## I.     Facts addressed in reply statement of material facts

At the time Plaintiff's claim materials were submitted to Defendant in October 2018, Defendant had not completed its evaluation of the claim. Pls.' SOMF at ¶ 70. Information in Plaintiff's possession as of October 2018 included the March Falcon Report, ONM&J's Engineering's November 1, 2017 report, Roof Leak Detection Company's March 9, 2018 report, Pritt's January 15, 2018 proposal for roof repairs, Delta's January 23, 2013 window assessment, and Delta's September 9, 2013 roofing assessment. Reply SOMF at ¶ 70. Defendant's engineering report was not completed until November 2018, and Defendant's estimate was not completed until January 2019. Pls.' SOMF at ¶ 71.

Jason Woodall, Defendant's damages expert, admitted to several deficiencies in his own estimate during his deposition. *Id.* at ¶ 74. Regarding the roofs, Mr. Woodall testified that his estimate includes simply re-spreading whatever gravel is still on the roof. *Id.* at ¶ 75. His estimate does not include any tar or hot mop to seal the gravel down, nor does it include any repairs to the membrane before the gravel is replaced. *Id.* The estimate also does not account for adding additional gravel to account for what may have blown off the roofs during the storm. *Id.* Mr. Woodall acknowledged that the failure to include these items was an oversight, and that he should have known that it needed to be done. *Id.* In fact, he testified that he never even inspected the building roofs. *Id.* He also acknowledged that his estimate only includes painting two sides of the buildings, and that this too is an error. *Id.* at ¶ 76. Mr. Woodall confirmed that, in fact, there was wind damage on all four sides of the buildings that would require painting. *Id.* Further, he admitted that he should have included protected equipment for the workers repairing both the windows and

the roof. *Id.* at ¶ 77. He also did not account for enough temporary toilets for the work that needed to be completed. *Id.* Additionally, he confirmed that the permit costs for the work on the exterior of the buildings were far too low. *Id.*

According to Defendant, Mr. Woodall "realized that his estimate contained some minor oversights related to: adding gravel to the roof; sealing the gravel; painting all four sides of the buildings instead of two; personal protection equipment; and temporary toilets. Immediately after his deposition, [Mr.] Woodall updated his estimates to include these items, which resulted in revised estimates of $650,366.23 for the tower located at 3400 Galt Ocean Drive and the Lobby, and $592,810.70 for the tower located at 3410 Galt Ocean Drive." Reply SOMF at ¶¶ 74-77. Plaintiff retained new experts, who issued reports in March 2020. Pls.' SOMF at ¶ 79 (citing ECF Nos. [55-5] and [55-13]).

### J.      Relevant policy language

The Policy contains a provision that provides as follows:

#### A. Concealment, Misrepresentation or Fraud

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this coverage part

ECF No. [1-2] at 25.

## III.    LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record,

including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c).

An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343.

In resolving the issues presented under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, No. 08-80113-CIV, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment.") (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913 (11th Cir. 1993)). Even "where the parties agree on the basic facts but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, No. 13-60820-CIV, 2013 WL 5596114, at *4 (S.D. Fla. Oct. 11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

Through this lens, the Court considers the Motion and the parties' arguments.

## IV.   DISCUSSION

Defendant moves for summary judgment arguing that the undisputed facts demonstrate Plaintiff breached the Policy's "Concealment, Misrepresentation or Fraud" provision by misrepresenting the cause and extent of its alleged damages and concealing evidence that undercuts the legitimacy of its claim. ECF No. [49] at 1. It asserts that while Plaintiff submitted a claim for nearly $30 million worth of wind-related damages to the Premises, including the total destruction of all exterior windows and the roofs, "[d]iscovery revealed that Plaintiff intentionally inflated its claim to include repairs it knew were not necessary as well as repair of damages it knew pre-existed the storm." *Id.* In particular, Defendant maintains that (1) Plaintiff claimed that all three roofs required replacement even though it knew that the roofs did not need to be replaced; (2) Plaintiff claimed that every single exterior window required replacement yet it knew that full replacement was not required, and knew that much of the damage claimed under the Policy was pre-existing; (3) Plaintiff was aware the actual cost of repairing storm-related damages was a fraction of the submitted claim; and (4) Plaintiff "actively sought to conceal documents and information that belied its contention that the buildings were in pristine condition before the loss and that all the observed damage was caused by Hurricane Irma." *Id.*

Defendant adds that the Policy provision at issue is enforceable under Florida law, and that it need not demonstrate reliance on the alleged misrepresentations when asserting a policy defense based on fraud. *Id.* at 6-7. Further, it contends that "[i]n Florida, the rule voiding a policy for false statements does not apply unless no other conclusion can be drawn than that a purposeful misrepresentation was intended." *Id.* at 7 (citing *Berkshire Mut. Ins. Co. v. Moffett*, 378 F.2d 1007, 1012 (5th Cir. 1967)). In this regard, it argues that "the only reasonable conclusion that can be

drawn from the record evidence is that Plaintiff intentionally inflated its claim to include repair costs it knew were not related to the storm." *Id.* at 8.

In response, Plaintiff asserts that the Motion is "laden with disputed material facts which are not properly raised or decided by motion for summary judgment," and that Defendant "has failed to satisfy its heavy burden of establishing that Southpoint intentionally inflated its claim to include repair costs it knew were not related to the storm." ECF No. [56] at 1. It adds that the allegations "constitute neither fraud nor misrepresentation as a matter of law," Defendant has not established that any of the alleged misrepresentations were material to Defendant's coverage determinations, and that "[a]t a minimum, these issues should properly be reserved for trial." *Id.* Additionally, Plaintiff argues that the Concealment, Misrepresentation or Fraud provision "does not apply to any alleged fraud or misrepresentation committed by [] Southpoint's representatives." *Id.* at 5. Moreover, it maintains that the record shows that Plaintiff has not made any intentional material misrepresentations or intentionally concealed any facts. *Id.* at 6. In this respect, it contends that the record demonstrates that (1) it did not intentionally inflate its claim by including the cost of replacing all of the roofs; (2) it did not intentionally inflate its claim by including the cost of replacing every single window; (3) it did not intentionally inflate its claim to seek damages well in excess of its actual repair costs; and (4) it did not intentionally conceal documents/information that undercut its claim. *Id.* at 6-18.

In reply, Defendant contends that there are "no disputed issues of fact relevant to whether Plaintiff's claim was intentionally inflated." ECF No. [60] at 1. In its view, the record evidence establishes that Plaintiff was an "active participant in the plot to inflate its claim to include repair costs and damages that were not related to the hurricane." *Id.* at 3. According to Defendant, the cases Plaintiff cites are "all easily distinguishable inasmuch as they involve mistakes, errors in

calculations and/or insureds with a good faith basis to believe the claims were legitimate." *Id.* at 5. Further, it argues that the cases Plaintiff cited in support of its argument that it cannot be held responsible for the actions of its agents are "inapposite." *Id.* at 6.

Upon review, the Court concludes that it is inappropriate, based on the record before it, to grant summary judgment in Defendant's favor for Plaintiff's alleged breach of the Concealment, Misrepresentation or Fraud provision in the Policy. As an initial matter, the parties seemingly agree that the provision is valid, reliance on the insured's misrepresentation need not be shown, and that only an intentional or purposeful concealment or misrepresentation of material facts triggers the provision.

"Certain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment. These matters can often only be proved by reliance upon circumstantial evidence except in the rare case where there is uncontr[o]verted proof of a 'smoking gun'. Viewing all the circumstances, a reasonable fact finder will have to hear all the evidence, weigh it and draw all reasonable inferences therefrom, and judge a witness' credibility prior to determining such issues." *Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1555 (S.D. Fla. 1990), *opinion amended on reconsideration in other parts*, 741 F. Supp. 220 (S.D. Fla. 1990). "As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined [at] trial." *Rodriguez v. GeoVera Specialty Ins. Co.*, 426 F. Supp. 3d 1318, 1329 (S.D. Fla. 2019) (denying summary judgment because fact issue remained as to whether insureds had requisite intent to constitute "fraud" or "misrepresentation" under the policy) (citation omitted); *See also State Farm Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1303 (S.D. Fla. 2018) (denying summary judgment as to whether defendants

26

violated Florida's insurance fraud statute because the alleged omissions and misrepresentations presented "a highly factual inquiry that is generally left for the finder of fact").

The "question of whether an insured has made a material misrepresentation is a question for the jury to determine." *Lopes v. Allstate Indem. Co.*, 873 So. 2d 344, 347 (Fla. 3d DCA 2004); *see also Haiman v. Fed. Ins. Co.*, 798 So. 2d 811, 811-12 (Fla. 4th DCA 2001) (noting that "materiality is a question of fact to be determined by the trier of fact" and holding that whether the insured's misrepresentations "constitute[d] a material misrepresentation which would void coverage should be determined by the trier of fact"). Similarly, an insurer's affirmative defense of fraud "is usually considered a jury question and is not ordinarily appropriate for summary judgment proceedings." *Pub. Health Tr. of Dade Cty. v. Prudential Ins. Co.*, 415 So. 2d 896, 897 (Fla. 3d DCA 1982).

In *Berkshire Mut. Ins. Co. v. Moffett*, 378 F.2d 1007 (5th Cir. 1967),[10] the Fifth Circuit explained that under Florida law, "the rule voiding a policy of insurance will not apply in its severity unless the proof of the false swearing was such that no other conclusion can be drawn than that a purported misrepresentation was intended. The questions of fraud or false swearing or overvaluation are questions for the jury to determine where there is probative evidence on the matter." *Id.* at 1012. Notably, the Court held that:

> It is the general rule of law with respect to sworn proofs of loss, that if such proofs contain false statements, known by the person making them to be false, for the purpose of perpetrating a fraud, the entire policy of insurance will be voided and the person making the fraudulent statement will take nothing under the policy, *Chaachou v. American Central Insurance Company*, 5 Cir. 1957, 241 F.2d 889. In that case we stated that 'This [holding] presents no danger that valuable rights will be lost by mere mistakes or errors in calculations, exaggerations in the amounts of the claims, or the assertion, even though doubtful, of coverage or other

---

[10] The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

contentions as to all or particular items when these flow from the mistaken good faith judgment or opinion of the assured or his agents. *Canners Exchange Subscribers at Warners Inter-Insurance Bureau v. North American Canning Co*., 5 Cir., 194 F.2d 588, 589. For the courts will [] make it positive that the insurer must satisfy the heavy burden of establishing that the conduct complained of was done and was a wilful, purposeful misrepresentation of facts having substantial materiality under circumstances to which the law would attribute the intention to defraud, *Claflin v. Franklin Ins. Co*., 110 U.S. 81, 3 S.Ct. 507, 28 L.ed. 76, that is, cheat, deceive and cause the insurer to do other than that which would have been done had the truth been told.' (241 F.2d at p. 893). Therefore, an overestimate of the value of goods lost in a fire, an error in judgment with respect to fixing a value, a mistake, or an inadvertence, will not render an insurance contract void. Since reasonable men may differ as to the values which they place on particular objects, the rule voiding a policy of insurance will not apply in its severity unless the proof of the false swearing was such that no other conclusion can be drawn than that a purposeful misrepresentation was intended. The questions of fraud or false swearing or overvaluation are questions for the jury to determine where there is probative evidence on the matter.

*Id.* at 1012. In that case, the insurer argued that a fire insurance policy was void because the evidence clearly showed that the plaintiff had attempted to defraud the insurer by falsely including in his original claim items which were not in a building at the time of fire and by overvaluation of destroyed property. *Id.* The plaintiff admitted that originally certain items had been claimed as destroyed in the fire yet were subsequently deleted from the proof of loss, and there was a conflict in the testimony whether certain other items were in the building at the time of the fire. *Id.* Based on the record in that case, the Fifth Circuit determined that "reasonable minds could easily differ as to whether the plaintiff was guilty of false s[w]earing and the same may be said with respect to the question whether there was a conscious, wilful, and fraudulent misrepresentation on the part of the plaintiff. The jury had before it the divergent estimates and opinions as to the value of the items involved and whether or not the items listed on the plaintiff's final proof of claim were in the building at the time of the fire." *Id.* at 1012-13.

Despite the foregoing, Defendant stresses that fraud is established as a matter of law in this case because the amounts claimed are "so far beyond what Plaintiff can prove[.]" ECF No. [49] at

8 (citations omitted). However, an insured's submission of a claim that is significantly higher than

what the evidence later supports is not dispositive of whether the claim is fraudulent. For instance,

in *El-Ad Residences at Miramar Condo. Ass'n, Inc. v. Mt. Hawley Ins. Co.*, No. 09-60723-CIV,

2010 WL 8961438 (S.D. Fla. Sept. 28, 2010), another court found that although the record

contained "troubling facts" regarding the property damages estimate submitted to the insurer, and

there was a "substantial difference" of millions of dollars between the estimate and the sworn proof

of loss, "[c]ontractors or adjusters may significantly differ in their estimates, and [the court] cannot

presume that one estimate, merely because it is excessively higher, is rife with fraud." *Id.* at *6-7.

Additionally, in *Badger Mut. Ins. Co. v. Morgan*, 313 F.2d 783 (5th Cir. 1963), the court rejected

an insurer's argument that the insured committed fraud as a matter of law because the jury award

was significantly less than the proof of loss submitted during the claims process. Notably, the Fifth

Circuit approved the Supreme Court's reasoning in a different case that the court "cannot accept

the view that a conclusive presumption of fraud arose because the verdict was far less than the

amount stated in the proof of loss. . . . Policy holders may present inaccurate proofs of loss without

conscious dishonesty or intent to defraud; different views of values are common; memory is faulty;

insurance company and assured often entertain widely different views concerning the policy; and

evidence cannot always be produced to establish something declared to be true in entire good

faith.'" *Id.* at 786 (citation omitted).

Here, the Court finds that, like in *El-Ad*, which similarly involved allegations that the

insured condominium association made material misrepresentations or committed fraud during the

claims process regarding hurricane damage, the record contains "troubling facts" regarding

whether Plaintiff intentionally overstated its claim or whether it intentionally attempted to conceal

or misrepresent information concerning the claim. 2010 WL 8961438 at *6-7 (determining that

question of whether insured breached the policy's fraud provision was for the jury even though the insured did not controvert evidence indicating that the insured knew its claim was overstated and that it "intended to profit from funds obtained in excess of the costs of actually repairing the roof"). However, Defendant carries a "heavy burden" in this setting, and it concedes that "the rule voiding a policy for false statements does not apply unless no other conclusion can be drawn than that a purposeful misrepresentation was intended." In this regard, when the Court views the facts in a light most favorable to Plaintiff, as the non-moving party, and draws all reasonable inferences in its favor, the Court finds that a genuine dispute exists as to whether Plaintiff breached the Concealment, Misrepresentation or Fraud provision in the Policy. Thus, this determination is best reserved for the jury at trial.

For example, regarding the roofs, Plaintiff argues that although it was aware that its insurance claim included the cost of replacing all three roofs at the Premises, it cites testimony that it believed that the DSS damages estimate was based on the scope of work prepared by Falcon. *See* ECF No. [37-3] at 164, 243-46. Likewise, it also produced a contract with DSS to support its contention that it believed DSS was identifying specific items of loss that required repair as a result of wind damage. ECF No. [55-11] at 11 (identifying DSS' "scope of services" to include "[r]epairs to roof . . . damaged by Hurricane Irma," "[a]ssist in the identification losses to support claim," and provide "estimating services to substantiate losses and support claim"). Plaintiff also produced evidence that "[p]art of DSS's responsibility was to maintain documentation related to the claim," and that Global Pro provided the claim package to the Board for review before it was submitted to Defendant, which package included the DSS estimate. ECF No. [55-7] at ¶¶ 9, 10, 13.

Further, the record contains testimony that Plaintiff did not seek "any other estimates for the cost of repairs in connection with its insurance claim" because "[t]hat's actually part of what

we hired DSS to do for us." ECF No. [37-3] at 239. Additionally, although the March 2018 Roof

Leak Detection Company report concluded that there were no areas of the roofing system that

required replacement, the report itself noted that it was not an "engineering report," ECF No. [22-

14] at 2, and Plaintiff produced evidence that it had completed repairs on the roof a few months

before that report was made. ECF No. [55-8]. Similarly, while Defendant cites the Pritts January

2018 email and proposal regarding performing roof repairs for $18,500.00, Plaintiff also points

out that in that email chain, Global Pro advised Mr. Johnson to "let the experts complete their

inspections and reports" and noted that "[n]o testing was performed and we have no idea the

conditions of the substrate. All of this will be confirmed by the experts so that an accurate

assessment of your damages can be made." ECF No. [49-1]. Indeed, when asked why Southpoint

did not follow the Pritts scope of repairs, Mr. Johnson testified that while Pritts' proposal was

considered, Plaintiff felt more comfortable relying on Falcon given "the expertise of an

engineering firm like Falcon," and how "you want to make sure that you're listening to that

assessment before you make your final conclusion." ECF No. [49-4] at 304-05.

Viewing all of this evidence in a light most favorable to Plaintiff, the Court does not find

that "no other conclusion can be drawn than that a purposeful misrepresentation [by Plaintiff] was

intended" regarding the roofs. Rather, this record supports an alternative finding that while the

claim included an estimate to replace all the roofs, at the time Plaintiff submitted the claim, it

inaccurately believed this was a valid recommendation of its representatives based on their work,

and not reflective of a fraudulent scheme. *See 200 Leslie Condo. Ass'n v. QBE Ins. Corp.*, 965 F.

Supp. 2d 1386 (S.D. Fla. 2013) (finding that insurer did not meet its burden of proving fraud and

concealment regarding the claim and rejecting insurer's argument to impute potential misconduct

by the insured's representatives to the insured).

Regarding the windows, Plaintiff cites testimony that before Hurricane Irma, the Premises underwent an extensive renovation project, which included caulking around windows as needed, and that after the renovation project, there were no problems with water intrusion in all but one unit. ECF Nos. [55-7] at ¶¶ 4-5; [55-9] at ¶¶ 10-11. *See also* ECF Nos. [37-3] at 73-74, 155; [49-7] at 13-16. However, after the storm, there was water damage in "nearly 300 of the 400 units." ECF Nos. [55-7] at ¶ 6; [55-9] at ¶ 12. Plaintiff also correctly notes that while the Delta January 2013 report, ECF No. [22-15], recommended replacing windows in 33 units surveyed, that survey comprises only ten percent of the Premises' units, and aside from replacements, the report also recommended conducting repairs to the windows, including resealing them. *Id.* That was purportedly done during the 40-year recertification project. Relatedly, Plaintiff testified that it believed that window replacement at the Premises was included in the DSS estimate based on Falcon's recommendation. ECF No. [37-3] at 164, 244. Further, Plaintiff notes that its contract with DSS tasked DSS with identifying losses to support the claim. ECF No. [55-11] at 11. Assessing all the evidence in a light most favorable to Plaintiff, the Court cannot conclude that the evidence only supports the view that Plaintiff intended to inflate its claim by including the cost of replacing every single window. Rather, the record supports the existence of a genuine dispute regarding Plaintiff's intentions, which determination is for the jury to resolve.

Regarding Defendant's argument that Plaintiff intentionally inflated its claim to seek damages well in excess of its actual repair costs, Plaintiff contends that although it issued a $2.2 million Special Loss Assessment, that was done to cover Plaintiff's deductible and to cover actual expenses that had been incurred rather than to fix all damages. ECF Nos. [55-7] at ¶ 7; [55-9] at ¶ 13. In this respect, it calls Defendant's charge "absurd" that the assessment reflects knowledge that it intended that amount to pay for all damages. Further, according to Plaintiff, the Age of Empire

contract has a "base contractual price" of approximately $1.47 million, which price "does not include the quantities of sealant, caulk, stucco, concrete, and related labor and general conditions to complete" the work, which "will increase" the final price once the quantities are known. ECF Nos. [55-7] at ¶¶ 19-20; ECF No. [55-9] at ¶¶ 23-24. Also, Plaintiff states that this work is only for temporary repairs to damage, and additional repairs at the Premises are still required, including replacing windows, repairing the roofs, and reconstructing the lounges. ECF Nos. [55-7] at ¶ 21; ECF No. [55-9] at ¶ 25.

Concerning comments made from the Board president during meetings, the Court finds that evaluating the meaning and ultimate intent of his words is fact-intensive, context-based, and inappropriate for resolution on summary judgment. For example, although he characterized the repair bids Plaintiff received as the "real numbers," his affidavit explains that he made this statement "because the contracts were for temporary repairs to prevent further water intrusion into the buildings, which must be done regardless of whether the claim was paid," the "bids did not encompass the full amount of work that would be necessary to repair the property as a result of Hurricane Irma," and he "was trying to explain to the resident that this contract did not match what was submitted with the insurance claim, because the repair proposals were not intended to completely repair all of the storm damage." ECF No. [55-7] at ¶ 18. Additionally, Plaintiff presents evidence that Defendant's damages expert acknowledged deficiencies in his own estimate, including undervaluing the damages. *See* Reply SOMF at ¶¶ 74-77.

Like in *El-Ad*, although Defendant points to evidence that "raise[s] legitimate doubts, [] that is not sufficient." 2010 WL 8961438, at *7. Here, the parties have submitted different explanations for the damage assessments and costs, and they each have presented evidence that the other party's damage evaluation was too high or too low. Whether Plaintiff ultimately intended

to misrepresent the costs of repairs through submitting a claim that is significantly higher than the actual repair costs, as Defendant asserts, is best left for the jury's determination. *See id.* ("Because these questions and issues preclude a definitive finding of misrepresentation or fraud on the part of [the insured], this is a determination for the jury.").

Regarding Defendant's contention that Plaintiff intentionally concealed documents and information that undercut the claim, although the record shows that Plaintiff did not produce items that were later produced by DSS, Plaintiff testified that part of DSS' "responsibility was to maintain documentation related to the claim," and that Plaintiff provided "extensive documentation, including all available maintenance records, repair and maintenance contracts, and boxes of documents related to pre-hurricane renovations." ECF No. [55-9] at ¶¶ 15, 28. Mr. Johnson further stated that Southpoint did not have an established record keeping system, and engineering reports were maintained in hard copies and stored in boxes with no indexes or contents lists. *Id.* at ¶ 29. Further, while every email containing the words "hurricane" or "Irma" was not initially produced by Plaintiff, that mere occurrence does not foreclose the possibility that the emails left out did not in fact show up under the email search or that they were inadvertently omitted. Nor does Plaintiff's failure to produce important documents during the course of discovery that should have been produced necessarily imply wrongful intent. Indeed, as Mr. Johnson states, he sifted through over two years of emails to respond to Defendant's requests, and after he was informed that there were relevant emails that may have been missed, he ran additional searches of his emails and again produced whatever emails he could find. *Id.* at ¶¶ 30-31.

Moreover, the significance of the March Falcon Report is not plainly determinable. Mr. Kolar, who authored the Falcon reports, acknowledged that the March report "contained information that may not necessarily be attributed to Hurricane Irma," and he removed certain

words, such as corrosion and deterioration, from the March Falcon Report because Falcon could not confirm one way or another whether these conditions pre-existed Hurricane Irma, and Falcon was concerned that these terms were ambiguous as to whether they were pre or post storm. ECF No. [49-2] at 36-37, 45-46, 85, 92-93. However, he also testified that there was an "intent [t]o clarify[] those words" and that the "intent" of Falcon's reports regarding the items damaged by Hurricane Irma "is still the same." *Id.* at 45-46. In this respect, although alterations to the report and removal of words can evidence wrongdoing, that is not the only possible conclusion that can be drawn.

Based on this record, the Court does not conclude that Plaintiff's actions conclusively show that it breached the Policy's Concealment, Misrepresentation or Fraud provision. Although Defendant expresses valid concerns and Plaintiff's explanations do not remove the possibility of impropriety, the Court does not agree with Defendant that the evidence "leads to one undeniable proposition: . . . [Plaintiff's] misrepresentations and concealment of relevant evidence fall squarely within the definition of insurance fraud." ECF No. [49] at 19. Indeed, Defendant carries a "heavy burden" to make this showing. *Chaachou*, 241 F.2d at 893. Much of the evidence Defendant relies upon calls for the Court to infer a guilty state of mind but to discount erroneous yet good faith beliefs, possible mistakes or inadvertence, and differing valuations over the scope of damages. In short, the evidence demonstrates that whether Plaintiff intended to commit a fraud or conceal or misrepresent information regarding the claim is an issue best reserved for the jury to resolve. Summary judgment, therefore, is inappropriate.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that the Motion, **ECF No. [49]**, is **DENIED**.

Case No. 19-cv-61365-BLOOM/Valle

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 16, 2020.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

36